BEFORE HON. TIMOTHY M. REIF, JUDGE

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| Tianjin Magnesium International Co., Ltd. and Tianjin Magnesium Metal Co., Ltd., <br><br> Plaintiffs, <br><br> v. <br><br> United States. | Court No. 25-00002 |

Memorandum of Law in Support of the Rule 56.2 Motion of Plaintiffs Tianjin Magnesium International Co., Ltd. and Tianjin Magnesium Metal Co., Ltd for Judgment the Agency Record

David J. Craven
Counsel to Tianjin Magnesium International Co., Ltd. and Tianjin Magnesium Metal Co., Ltd

Craven Trade Law LLC
3744 N Ashland
Chicago, IL 60613
(773) 709-8506
David.craven@tradelaw.com

Date June 5, 2025

# TABLE OF CONTENT

Table Of Contents ............................................................................. i

Table Of Authorities ....................................................................... ii

I.   INTRODUCTION .........................................................................1

II.  STATEMENT PURSUANT TO RULE 56.2(c)...........................2

    *A.* Administrative Determination Under Review...........................2

    *B.* Issues of Law ........................................................................3

    *C.* Summary of Argument ..........................................................3

    *D.* Statement of Facts ...............................................................4

III.  STANDARD OF REVIEW .........................................................6

IV.  ARGUMENT...............................................................................10

    A. The Department Determination to use Turkey as a Source of Surrogate Values in not Supported by Substantial Evidence and is Otherwise not in Accordance with Law ..................................................10

       1.  Bulgaria's Data Should have been Fully Considered ........................10

       2.  The Department did not Use any Data for Subject Merchandise from Turkey......................................................................13

       3.  The Department must use a Consistent methodology from one Review to the Next .................................................................14

    B. The Quality of Data from Bulgaria is Superior to that of Turkey............16

       1.  The Import Data for Dolomite from Turkey is aberrational ..............17

       2.  The GTA Data from Turkey was Incomplete ....................................19

       3.  The Turkish Electricity Price was Flawed ..........................................19

       4.  Turkey is a Hyper-Inflationary Economy .........................................20

       5.  Bulgaria's Data is Superior ..............................................................20

    C. The Department did not Fully Consider Arguments Presented by Plaintiff .................................................................................21

III.  CONCLUSION...........................................................................21

TABLE OF AUTHORITIES

*Case Law:*

*Atlantic Sugar, Ltd. v. United States*, 2 Fed. Cir. 130, 744 F.2d. 1445, (1984)..................................................................................................7,9

*Carpenter Technology, et al. v. United States*, 33 CIT , Slip Op. 09-134 (November 23, 2009)...........................................................................6

*Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837 (1984).............................................................................................7

*Consolidated Edison Corp. v. Labor Board*, 305 U.S. 197 (1938) .........................8

*Diversified Products Corp. v. United States*, 6 CIT 155  (1983) .............................9

*Dorbest Ltd v. United States*, 462 F. Supp. 2d 1262  (Ct. Int'l Trade 2006)............9

*Fagersta Stainless AB v. United States,*  577 F. Supp. 2d 1270 (Ct. Int'l Trade 2008)...............................................................................15

*Gerald Metals, Inc. v. United States*, 132 F.3d 716  (Fed. Cir. 1997).......................9

*Ghigi 1870 S.p.A. v. United States,*  547 F. Supp. 3d 1332 (Ct. Int'l Trade 2021) ..............................................................................15

*Jiaxing Brother Fastener Co., Ltd v. United States*, 822 F.3d 1289 (Ct. Int'l Trade 2016)..............................................................................12,13

*Jinan Yipin Corp. v. United States*, 33 CIT , Slip Op. 09-70 (July 2, 2009)..........6,9

*Koyo Seiko Co. v. United States*, 796 F. Supp. 1526, 16 CIT 539 (1992)................6

*Koyo Seiko Co. v. United States,* 516 F. Supp. 2d 1323 (Ct. Int'l Trade 2007), *aff'd* 551 F.3d 1286 (Fed. Cir. 2008) ..................................................15

*La Molisana S.p.A. v. United States*, 633 F.Supp.3d 1266 (Ct. Int'l Trade 2023) .............................................................................15

*Loper Bright Enterprises, et al., Petitioners, v. Gina Raimondo, Secretary of Commerce*, et al.  144 S.Ct. 2244, (June 28, 2024) ................................7,8

*Manchester Tank and Equipment Co. v. United States,* 483 F. Supp. 3d 1315 ( Ct. Int'l Trade 2020).........................................................14

*SKF USA, Inc. v. United States,* 537 F.3d 1373 (Fed. Cir. 2008) ........................14

*Taian Ziyang Food v. United States*, 33 CIT , Slip Op. 09-67 (June 29, 2009) ...............................................................................6

*Universal Camera Corp. v. NLRB*, 340 U.S. 474 (1951) ......................................8,9

*USX Corp. v. United States*, 11 CIT 82, 655 F. Supp. 487 (1987)...........................9

**Statutes**

19 U.S.C. §1516a(a)(2)(A)(i)(I)...................................................................................2

19 U.S.C. §1516a(a)(2)(B)(iii)......................................................................................2

19 U.S.C. § 1516a(b)(1)(B)(I) ......................................................................................6

19 U.S.C. §1673d(c)(5)..................................................................................................7

28 U.S.C. §1581(c) ........................................................................................................2

BEFORE HON. TIMOTHY M. REIF, JUDGE

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| Tianjin Magnesium International Co., Ltd. and Tianjin Magnesium Metal Co., Ltd.,<br><br>　　　　　　　　Plaintiffs,<br><br>　v.<br><br>United States. | Court No. 25-00002 |

Memorandum of Law in Support of the Rule 56.2 Motion of Plaintiffs Tianjin Magnesium International Co., Ltd. and Tianjin Magnesium Metal Co., Ltd for Judgment the Agency Record

## I.　INTRODUCTION

This is an appeal from the final results of the administrative review of the Antidumping Duty Order on *Pure Magnesium From the People's Republic of China, 89 Fed. Reg. 100967* (December 13, 2024) ("Final Determination") (P.R.[1] 121) and its accompanying Issues and Decision Memorandum (December 6, 2024) ("FIDM") (P.R.117). Plaintiff Tianjin Magnesium Metal Co., Ltd was a party to the proceeding, having submitted numerous questionnaire responses and comments, as well as case briefs.　Plaintiff Tianjin Magnesium International Co., Ltd was collapsed into TMMC.

---

[1] Pursuant to standard chamber procedures, the record is identified as "P.R." for Public Record and "C.R." for Confidential Record.

Plaintiff asserts the following errors in the Commerce Department's ("Commerce" or "The Department") final determination:

- The Department erred when it found that Turkey was a substantial producer of subject merchandise while also finding that Bulgaria was not a substantial producer of subject merchandise.
- The Department erred when it found that the data quality from Turkey was good and further erred when it did not find that the data quality from Bulgaria was superior.
- The Department erred when it did not fully consider arguments presented by plaintiff in issuing the final results.

## II.    STATEMENT PURSUANT TO RULE 56.2(c)

### A. Administrative Determination Under Review

This action is brought pursuant to the authority of 19 U.S.C. §1516a(a)(2)(A)(i)(I), 19 U.S.C. §1516a(a)(2)(B)(iii), and 28 U.S.C. §1581(c) to contest the U.S. Department of Commerce (Commerce) 2022–2023 administrative determination *of Pure Magnesium From the People's Republic of China, 89 Fed. Reg. 100967* (December 13, 2024) ("Final Determination") (P.R. 121) and the accompanying Issues and Decision Memorandum (December 6, 2024) ("PIDM")(P.R. 117). Commerce issued amended final determination correcting ministerial errors, 90 Fed. Reg. 7078 (January 21, 2025), but such errors are unrelated to the substance of this matter.

In the final results, Commerce calculated a margin of 32.60% for plaintiffs. (P.R. 121) which was subsequently adjusted to 25.26%. (Amended Final Results)

(P.R. 129).

B. *Issues of Law*

The Plaintiffs present the following issues of law.

1. Whether the Department erred in selecting Turkey as a surrogate country and whether its determination that Bulgaria is not a significant producer of subject merchandise is contrary to the evidence of record.

2. Whether the Department must use consistent methodology from one review to the next absent a good reason for making a change from prior methodology and cannot prefer a new methodology based on out-of-period data.

3. Whether in evaluating the quality of data the Department must consider the high rate of inflation in a potential surrogate country.

4. Whether in evaluating the quality of data the Department must consider the aberrational nature of certain data and the absence of data for certain factors of production.

5. Whether the Department is required to address arguments made by plaintiff, or whether the Department may simply ignore such arguments.

C. *Summary of Argument*

- The Department's determination that Turkey was a substantial producer of subject merchandise and that Bulgaria was not a substantial producer of subject merchandise is contrary to the facts. The data which formed the basis of this analysis consisted of out of period data which also only

3

considered a portion of in-scope merchandise. Further, such data was of a type not previously considered by the Department. In contrast data of the type used by the Department in prior reviews, which data was broader in nature and covered all of the products within the scope of the order and which was from the POR was not used.

- The Department did not full evaluate the quality of the data provided from both Bulgaria and Turkey. Had the Department done so, as requested by plaintiff, it would have established that the Bulgarian data was superior to that of Turkey.
    - o The import data for dolomite for Turkey was aberrational and not representative of actual import data
    - o The GTA data used as a basis for Surrogate Values from Turkey was incomplete. In contrast, the data for Bulgaria was complete.
    - o The Turkish data did not include reliable energy prices. In contrast, the data for Bulgaria was complete.
    - o Turkey is a hyper-inflationary economy and certain of the data used for surrogate values were impacted by this hyper-inflation. In contrast, data from Bulgaria does not have such flaw.
- The Department did not fully consider arguments presented by plaintiff. Specifically, the Department did not fully consider the arguments establishing the serious flaws in the data for Turkey and thus did not determine whether the Turkish data was unusable.

*D. Statement of Facts*

On July 12, 2023 the Department initiated this matter in response to a request for review filed by the U.S. domestic industry on May 26, 2023. See *Initiation of Antidumping and Countervailing Duty Administrative Reviews,* 88 Fed. Reg. 44262 (July 12, 2023). (P.R. 7). Between August 8, 2023 and April 30, 2024, plaintiffs submitted responses to the Department's questionnaires.

On December 18, 2023 the Department published the preliminary results as *Pure Magnesium from the People's Republic of China: Preliminary Results of*

*Antidumping Duty Administrative Review; 2022–2023* 89 Fed. Reg. 48149 (June 5, 2024). (P.R. 92). Plaintiffs were assigned a rate of 93.97%.

On July 18 to July 24, 2024 the Department conducted an in-person verification of the responses of plaintiffs in Tianjin and Jinfeng China. (P.R. 95)

On August 13, 2024 the Department issued its verification report summarizing the findings of the verification. (P.R. 99)

On August 27, 2024, plaintiffs as well as the U.S. domestic industry, filed administrative case briefs with the Department of Commerce challenging the preliminary results. (P.R. 103 and P.R. 104)  On August 29, 2024, pursuant to a request from the Department, plaintiffs resubmitted their case brief. (P.R. 107)

On September 3, 2024 plaintiffs and the domestic industry filed administrative rebuttal briefs with the Department of Commerce. (P.R. 108 and P.R. 109)    Plaintiffs, pursuant to a request from the Department, resubmitted the rebuttal brief on September 26, 2024. (P.R.113).

12.    On December 9, 2024 the Department issued the final results. (P.R. 116).  On December 13, 2024,  these results were published in the Federal Register as *Pure Magnesium from the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2022–2023,* 89 Fed. Reg. 100967 (December 13, 2024). (P.R. 12).  In the final results the Department assigned a rate of 32.60% to plaintiffs.  The Department also issued a final Issues and Decisions

Memorandum. ("FIDM") (P.R. 117)

13.    Such rate was modified to 25.26% in amended final results published as *Pure Magnesium from the People's Republic of China: Amended Final Results of Antidumping Duty Administrative Review; 2022–2023* at 990 Fed. Reg. 7079 (January 21, 2025).  (P.R. 129).

## III.    STANDARD OF REVIEW

The standard of review of a final determination made by the Department of Commerce in an antidumping duty case is set forth in 19 U.S.C. § 1516a(b)(1)(B)(I) as follows: "The Court shall hold unlawful any determination, finding or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." Therefore, the Court must remand any administrative determination made by the Department, which is unsupported by substantial evidence on the record as a whole or is otherwise not in accordance with law. *Koyo Seiko Co. v. United States*, 796 F. Supp. 1526, 1528, 16 CIT 539 (1992). Decisions of the Commerce Department "must be supported by adequate reasoning *Taian Ziyang Food v. United States*, 33 CIT , Slip Op. 09-67 (June 29, 2009) at 74 and 109; *Jinan Yipin Corp. v. United States*, 33 CIT , Slip Op. 09-70 (July 2, 2009) at 11; *Carpenter Technology, et al. v. United States*, 33 CIT , Slip Op. 09-134 (November 23, 2009) at 13. "Substantial evidence on the record means 'more than a mere scintilla' and 'such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion,' taking into account the entire record, including whatever fairly detracts from the substantiality of the evidence." *Atlantic Sugar, Ltd. v. United States*, 2 Fed. Cir. 130, 136, 744 F.2d. 1445, 1452 (1984) (footnote omitted).

At one time, in order to determine whether Commerce's interpretation and application of 19 U.S.C. §1673d(c)(5) is "in accordance with law," the courts reviewed the statute to determine whether "Congress has directly spoken to the precise question at issue." *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984). This doctrine was recently summarized by the U.S. Supreme Court as follows:

> Our *Chevron* doctrine requires courts to use a two-step framework to interpret statutes administered by federal agencies. After determining that a case satisfies the various preconditions we have set for *Chevron* to apply, a reviewing court must first assess "whether Congress has directly spoken to the precise question at issue." *Id.,* at 842. If, and only if, congressional intent is "clear," that is the end of the inquiry. *Ibid.* But if the court determines that "the statute is silent or ambiguous with respect to the specific issue" at hand, the court must, at *Chevron*'s second step, defer to the agency's interpretation if it "is based on a permissible construction of the statute." *Id.,* at 843. The reviewing courts in each of the cases before us applied *Chevron*'s framework to resolve in favor of the Government challenges to the same agency rule.
>
> *Loper Bright Enterprises, et al., Petitioners, v. Gina Raimondo, Secretary of Commerce*, et al. 144 S.Ct. 2244, 2254 (June 28, 2024)

The concept of *Chevron* deference was overturned by *Loper Bright Enterprises et. al. v. Raimondo*, 144 S.Ct. 2244 (2024). The Supreme Court stated:

The deference that *Chevron* requires of courts reviewing agency action cannot be squared with the APA.

*Loper* at 2249.

The Supreme Court summed up the *Loper* decision by stating:

*Chevron* is overruled. Courts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority, *Chevron* is overruled. Courts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority, as the APA requires. Careful attention to the judgment of the Executive Branch may help inform that inquiry. And when a particular statute delegates authority to an agency consistent with constitutional limits, courts must respect the delegation, while ensuring that the agency acts within it. But courts need not and **under the APA may not defer to an agency interpretation of the law simply because a statute is ambiguous**.

*Loper* at 2273.

Pursuant to *Loper Bright Enterprises, et al., Petitioners, v. Gina Raimondo, Secretary of Commerce, et al.* 144 S. Ct. 2244 (2024), which struck down the a portion of the concept of *Chevron* deference doctrine, the ultimate deference owed to an agency interpretation is not clear.

This Court must hold as unlawful any decision by the Department, which is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, and not supported by substantial evidence on the record. Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951), *quoting Consolidated Edison Corp. v. Labor*

*Board*, 305 U.S. 197, 229 (1938). Furthermore, "substantial evidence" must be measured by the record as a whole, "including whatever fairly detracts from the substantiality of the evidence." *Atlantic Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984) (quotations omitted). Thus, "it is appropriate to set aside the ITA's decision when the court 'cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to {that} view.'" *Diversified Products Corp. v. United States*, 6 CIT 155, 161 (1983) *quoting Universal Camera*, 340 U.S. at 488.

Moreover, Commerce's determination cannot be based on "isolated tidbits of data which suggest a result contrary to the clear weight of the evidence." *USX Corp. v. United States*, 11 CIT 82, 84, 655 F. Supp. 487, 489 (1987). The substantial evidence standard requires more than mere assertion of 'evidence which in and of itself justified {the determination}, without taking into account contradictory evidence or evidence from which conflicting inferences could be drawn.'" *Gerald Metals, Inc. v. United States*, 132 F.3d 716, 720 (Fed. Cir. 1997) (citation omitted).

Commerce also must make its decisions based on a fair and balanced comparison of the data. To do otherwise is arbitrary and capricious. *See Atlantic Sugar, Ltd. v. United States*, 744 F.2d at 1562 ("substantial evidence" must be measured by the record as a whole, "including whatever fairly detracts from the

substantiality of the evidence.")  *See also, Jinan Yipin Corp. v. United States*, 637 F.

Supp. 2d 1183, 1192 (Ct. Int'l Trade 2009).

Commerce is required to objectively evaluate all data on the record.  Thus, the

agency must hold its preferences to the same test as it uses to evaluate respondent's

proffered data.  *See, e.g., Dorbest Ltd v. United States*, 462 F. Supp. 2d 1262, 1302

(Ct. Int'l Trade 2006) (holding that Commerce must justify its decisions).

## IV.   ARGUMENT

### A. The Department Determination to use Turkey as a Source of Surrogate Values in not Supported by Substantial Evidence and is Otherwise not in Accordance with Law

In the final results, the Department selected Turkey as the primary surrogate

country and thus the primary source of surrogate values.  (FIDM at 12, P.R. 117).

This decision, however, is not supported by substantial evidence and is thus

otherwise not in accordance with law.  This error by the Department was the final

result of a series of missteps by the Department.

### 1.   Bulgaria Should Have Been Fully Considered

The Department erroneously found that Bulgaria only produced comparable

merchandise while Turkey and Malaysia produced identical merchandise.  This is

factually wrong.  Initially, the Department failed to properly determine the proper

comparison product.  The proper comparison product is product that falls within

scope.  Critically, the subject merchandise is broader than the simple production of

pure magnesium but rather covered a broader range of products.  The order clearly

states: "Merchandise covered by the Order is pure magnesium **regardless of**

10

chemistry, **form or size**, unless expressly excluded from the scope of the Order". It further states that "Pure magnesium products covered by the Order are currently classifiable under Harmonized Tariff Schedule of the United States (HTSUS) subheadings 8104.11.00, 8104.19.00, 8104.20.00, 8104.30.00, **8104.90.00**, 3824.90.11, 3824.90.19, and 9817.00.90." (Preliminary IDM Memo ("PIDM") (P.R. 86)

The scope clearly establishes that the subject merchandise is not limited to those forms classified under 8104.11.00 or 8104.19.00. The scope covers all forms of pure magnesium, including those "Articles of Magnesium" under 8104.90.00. That Bulgaria's exports of pure magnesium are mainly under 8104.90.00 does not change the fact that such goods are subject merchandise, i.e., identical merchandise. (Letter From Craven Trade Law Llc To Sec Of Commerce Pertaining To TMMC, Sv Cmts, ("PSV") ( P.R.34)

The Department has a consistent practice of determining whether a country is a substantial producer of subject merchandise based on export data. Such data was placed on record by both plaintiffs and the U.S. domestic industry. (FIDM at 10, P.R. 127). Such data consistently establishes that Bulgaria had significant exports of subject merchandise. This point is not in dispute. However, petitioner placed on record other data which further supported the production of certain types of subject merchandise. Such information was U.S. Geological Survey data for 2021 and was data only for the production of primary magnesium. ("PIDM at 10)(P.R. 86). As clearly stated in the PIDM, this data was limited to production of primary

magnesium and thus, at most that the data showed the Bulgaria might not be a producer of primary magnesium, but did not provide any information with respect to the production of subject merchandise in Bulgaria.  Petitioner argued that such data overrides the other, traditionally used data.  Critically, that much of the Bulgarian data was not of primary production, but rather was the production of magnesium under 8104.90.90 which included downstream articles, such as structural parts which are within the scope of the order.  In essence, petitioner asked the Department to relatively weigh the amount of primary foreign production, and critically ignore a whole subset of data for production of other scope product and the Department agreed with this baseless allegation.   Plaintiff submits that this determination is contrary to the established Department practice where the evaluation is whether a country is a producer of scope merchandise, and once eligible, a country is considered eligible for selection and the quantity or value of such production, is not a factor in selection. *Jiaxing Brother Fastener Co., Ltd v. United States*, 822 F.3d 1289 (Ct. Int'l Trade 2016).

In sum, Bulgaria may not have been a primary producer of pure magnesium, but Bulgaria was a substantial producer of scope merchandise and was thus a significant producer of subject merchandise and thus appropriate for selection as the surrogate country at the first level.

Once a determination has been made as to whether certain countries are substantial producers, the determination is ultimately based on the other factors. *Jiaxing Brother Fastener Co., Ltd v. United States*, 822 F.3d 1289 (Ct. Int'l Trade 2016).

### 2. The Department did not Use any Data for Subject Merchandise from Turkey

The Department made a determination to use Turkey as the source for surrogate values based, in part, on its finding that Turkey was a producer of identical merchandise. Such determination was, however, ultimately irrelevant as no data for Turkey for identical merchandise was used, rather the data was for similar merchandise. (SV Memo P.R. 90). Since the Department did not use the data for identical merchandise from Turkey, any such preference was not relevant. In fact, neither Petitioner nor Plaintiff submitted financial statements for any magnesium producers in any of the surrogate value comments or rebuttal comments. Magnesium production is a small industry with the majority of production located in China. That there are no publicly available financial statements for pure magnesium producers in all potential surrogate countries has been acknowledged by both parties in the instant review as well as all prior reviews. Specifically, in its December 15, 2023 submission of surrogate values, petitioner only supplied financial statements for an Aluminum Producer in Turkey and a Steel Producer in Turkey. (Letter From King & Spalding LLP to Sec Of Commerce Pertaining To Petitioner Surrogate Value

Submission at page 2) (P.R. 50). This further supports the proposition that it is essentially irrelevant whether or not Turkey or Malaysia have primary production of magnesium since only comparable merchandise producer's data will be used, and in any event, as discussed above, the scope is broader than the primary production of magnesium. In fact, in this review the financial statements that were used were for comparable merchandise --- aluminum. (SV Memo P.R. 90).

In sum, there is no uncontroverted evidence that Bulgaria was not a producer of pure magnesium products that fall under the scope of the order and there is no uncontroverted evidence that Turkey was a producer of primary magnesium, and in fact, both were "similar" producers that also produced and exported goods that fell within the scope of the order. The evaluation should have been based on the quality of the data and Bulgaria and Turkey should have been considered as "the same" for purposes of being a significant producer.

3. The Department must use a Consistent methodology from one Review to the Next

The Department must use consistent methodology from one review to the next and should not change without a good reason to make such change. The Courts have stated:

> This Court and the Federal Circuit "have looked for `compelling reasons' when Commerce {itself} modifies a model-match methodology in a review after having used that methodology in previous segments of the proceeding." *Manchester Tank,* 44 CIT at ___, 483 F. Supp. 3d at 1315 (first citing *SKF USA, Inc. v. United*

14

*States,* 537 F.3d 1373, 1380 (Fed. Cir. 2008); then citing *Koyo Seiko Co. v. United States,* 31 C.I.T. 1512, 1517-18, 516 F. Supp. 2d 1323, 1331-32 (2007), *aff'd* 551 F.3d 1286 (Fed. Cir. 2008); and then citing *Fagersta Stainless AB v. United States,* 32 C.I.T. 889, 894-95, 577 F. Supp. 2d 1270, 1276-77 (2008)). "'Compelling reasons' require the agency to provide `compelling and convincing evidence that the existing model-match criteria are not reflective of the merchandise in question, that there have been changes in the relevant industry, or that there is some other compelling reason' requiring the change." *Id.* (quoting *Fagersta,* 32 C.I.T. at 894, 577 F. Supp. 2d at 1277). So too, must respondents provide a compelling reason to change the model-match criteria by presenting their proposed modifications and supporting evidence to Commerce during the administrative process. *See Ghigi 1870 S.p.A. v. United States,* 45 CIT ___, ___, 547 F. Supp. 3d 1332, 1349 (2021).
*La Molisana S.p.A. v. United States*, 633 F.Supp.3d 1266, 1272 (Ct. Int'l Trade 2023)

While this case applies directly to model-match, the same principal would apply to all methodological choices in AD/CVD cases. In this review, for the purposes of determining whether a country was a significant producer of subject merchandise, the Department used data of a type not used in prior reviews. In prior reviews, the Department used trade data. In this case, the Department decided to use other data – specifically U.S. Geological Survey data for the production of primary magnesium, a product which falls within the scope of the order, but is much narrower than the products in the order. Such data was not used to include specific companies, but rather to exclude countries not listed. ("PIDM at 10)(P.R. 86). Further compounding this error, this data was out-of-period data covering 2021, which is a period prior to the POR, and not for the POR. Petitioner tried to

"minimize" this on the basis that this survey data is released less frequently, but this does not change the basis fact that such data was out of period.   In sum, rather than using in-period data of a type of data consistently used in prior reviews, the Department, without adequate explanation, changed to use a whole different, more limited set of data based on out of period, data.

Where, as here, the Department has two sources of data – one of a type of data used in the past and falls within the POR and covers the full scope of products subject to the order, and the other is a type of data not used in the past, such data falls outside of the POR, and covers a narrower range of product, the Department cannot, without good cause, prefer the new type of out-of-period data over the data used in prior reviews of in-period data.

B.  The Quality of Data from Bulgaria is Superior to that of Turkey

The most critical issue in this matter is the quality of data.  The DOC elected to use the data from Turkey notwithstanding multiple serious problems with the quality of the data, and critically, the absence of the same flaws in the Bulgaria data. Any one of these flaws should have been sufficient to force the rejection of the data, taken as a totality, there is simply no support for a finding that the quality of data of Turkey is superior.

1.  The Import Data for Dolomite from Turkey is aberrational.

The import data from Turkey for Dolomite is aberrational. Dolomite is a high-bulk low value rock. This is a well-known fact, which was confirmed by the Department in this review during the plant tour conducted in conjunction with verification. (Verification Report at 10, P.R.99). Dolomite is one of the two major inputs in the production of magnesium. The surrogate value of dolomite is most crucial to the normal value of the subject merchandise since one metric ton of subject merchandise consumes more than 10 tons of dolomite as reported, which means a distortion on per metric ton price of dolomite will be enlarged by more than 10 times in the determination of the normal value of per metric ton of subject merchandise. However, Turkey's import data for dolomite is aberrational on both quantity and price.

Turkey imported 124,720 kg (124.72 metric ton) of dolomite under HS 251810 during the POR in 20 monthly transactions, among which 7 monthly transactions have a quantity below 100kg (0.1metric ton) for each, and 2 below 200kg (0.2 metric ton) for each, while the dolomite placed into the kiln is more than 10 metric ton at a time and more than 100 metric tons per day in a small factory like plaintiff's supplier in the instant review. This is clearly an insufficient quantity for any production. (Rebuttal to Petitioner Comments at page 5) (P.R.61). The import quantities for Turkey are insignificant as regarding to a high-bulk low value rock like dolomite. The 9 transactions from Turkey discussed above add up to about 1 metric ton, far less than a normal container. Even 1 ton of Dolomite is not a commercial quantity. Simply put the Turkey import quantities, most of which are for a few kilograms in each transaction and are obviously aberrational as regarding to a high-bulk low value rock like dolomite. (P.R. 88).

In its April 29, 2024 Surrogate Value submission at pages 9 through 10, (P.R. 75) plaintiff provided an analysis comparing the import price of dolomite for those countries on the list, i.e., Romania, Chile, Bulgaria and Costa Rica, Turkey and Malaysia, for demonstrating the import value of for Turkey is "aberrational", as follows:

| Country | US$ | MT | Price | Unit |
|---|---|---|---|---|
| Romania | 824,000 | 19,601 | 42.04 | US$/MT |
| Costa Rica | 3,178,000 | 17,265 | 184.07 | US$/MT |
| Chile | 3,676,000 | 47,220 | 77.85 | US$/MT |
| Bulgaria | 250,367 | 4,944 | 50.64 | US$/MT |
| Turkey | 45,434 | 124 | 364.29 | US$/MT |
| Malaysia | 312,417 | 812 | 384.60 | US$/MT |
| **Total** | **8,286,219** | **89,967** | **92.10(average)** | **US$/MT** |

This comparison establishes that Turkey's import quantity are negligible as compared to any other country on the list. Turkey's import quantity is 0.139% of the total. Furthermore, the import prices are several times higher than the one of any other country, or FOUR times higher than the average price of all the six countries.

Further, plaintiffs provided publicly available market information indicating the dolomite price in EU is between $57-$210 per ton among countries while between $7.7-$30 per ton in Asia. See December 21, 2023 Rebuttal Comments of petitioner at page 6 and its Exhibit 2 and 3 (P.R. 61). Such data was not submitted as a market price for use as surrogate value, but it provided a baseline of the overall world prices of Dolomite and establishes the aberrational nature of the Turkey dolomite prices. Even the highest price in EU is far lower than the ones in Turkey import data used by the Department.

2.  The GTA Data from Turkey was Incomplete

The GTA data from Turkey was incomplete as there was no data for the price of natural gas.  Plaintiff's producer used natural gas in gaseous state, as the gas pipe shown during the verification.  Verification report at page 10 (P.R.99).  Turkey does not have import data for natural gas in a gaseous state, which is HTS 271121 (Mineral Fuels, Mineral Oils And Products Of Their Distillation; Bituminous Substances; Mineral Waxes; -- Petroleum Gases And Other Gaseous Hydrocarbons; -- Natural Gas, Gaseous).    This is the correct HTS as confirmed by the unused Malaysian surrogate value provided by Petitioner and by plaintiff's surrogate value data of October 30, 2023 at Exhibit SV-2. (P.R. 34).  As the Department knows, under the harmonized system, the 6-digit level HTS codes are identical among all countries. The Turkish GTA data provided by Petitioner was at the 4 digit level, i.e., 2711 (P.R. 52 and P.R. 89) which covers 6-digit level HTS codes of 271112, 271113, 271114, 272119, and 272129 Petitioner December 15, 2023 Submission Of Surrogate Values, Exhibit I-2(P.R. 52), which are liquified gas and gas other than natural gas. There is no data for 271121 in Petitioner's surrogate value submissions.

The Turkey GTA data provided by Petitioner, and used by the Department, was not for natural gas in a gaseous state.  Liquified gas is totally different from gaseous natural gas in all aspects including unit price.  In contrast, the data for Bulgaria did include such value (along with all other values).

3.  The Turkish Electricity Price was Flawed

The electricity price provided for Turkey was not for industrial use.    The Turkish electricity was for "commercial warehouse" ("Price based on monthly bill for commercial warehouse in case study for city covered") Petitioner December 15, 2023 Submission Of Surrogate Values Part II Exhibit I-4 (P.R.52). Petitioner did not provide a Turkey electricity price for industrial users.   Electricity is a critical input

and the absence of this input in the surrogate data raises questions.  In contrast, the surrogate value for Bulgaria was provided and is of record.

### 4.  Turkey is a Hyper-Inflationary Economy

 Turkey has a high rate of inflation, which inflation artificially increased the prices of the key inputs.   This hyper-inflation has resulted in aberrational factor values, even if certain of the values were adjusted  Specifically, the Turkey value of labor is of 2022 with inflator 1.1467; electricity, truck freight and Brokerage & Handling are of 2020 with inflator 2.36; Ocean insurance is of 2014 with inflator 4.58. (Preliminary Surrogate Values P.R. 88).

Further, the inflators used by the Department do not differentiate among sectors and products and presume an even across the board inflation.  This is not reasonable, particularly with things such as Ocean insurance and freight which are tempered by international pricing.   The application of the inflators in a hyper-inflationary economy results in significant distortions.   It is clear that the hyperinflation of Turkey has made the value of almost half of the factors aberrational. The assertion that a hyper-inflation does not affect the use of surrogate value is only when the hyper-inflation is not used in calculating the surrogate value. Here is obviously not the case. Turkey hyper-inflation was used for calculating surrogate value for multiple factors.

In contrast, Bulgaria's data does not display the same flaws.   Bulgaria is a member of the European Union and necessarily does not have high inflation.

### 5.  Bulgaria's Data is Superior

Based on the foregoing, it is clear that the Turkish data is badly flawed while the Bulgarian data is not badly flawed.  The Turkish data is flawed as it is missing critical surrogate values.   The Bulgarian data is complete.   The Turkish data is

flawed as it does not contain key energy inputs.   The Bulgarian data contains the key energy inputs.   The Turkish data included data significantly impacted by the hyper-inflationary economy in Turkey, even if certain data was not affected.  The Bulgarian data was not affected by hyper-inflation.

In sum, the Turkish data is badly flawed and the Bulgaria is far superior.  The Department erred when it used the inferior Turkish data.

C.  The Department did not Fully Consider Arguments Presented by Plaintiff

In the final issues and decisions memorandum, the Department did not fully consider certain arguments presented by plaintiff, but rather provided at best summary responses.    The Department should be required to fully explain its decisions.  Specifically, the Department did not fully address the data quality issue citing to the "failure" of Bulgaria to satisfy the production of comparable merchandise as a reason to not consider this issue. (FIDM at 8 – 9.) (P.R. 117).   The arguments presented with regard to the "quality of data" was fully relevant to the Department's determination as the arguments presented by plaintiffs essentially disqualified the Turkish data.

## III.   CONCLUSION

In conclusion, the Court should find that the Department erred when it found that Turkey was the appropriate source of surrogate values for valuing the factors of production in this matter.   The data for Bulgaria, which was superior to that of

Turkey was improperly not considered based on an incorrect determination that Bulgaria was not a producer of subject merchandise. Such determination was based both on the use of out-of-period data covering a limited range of products and a failure to take into account the full scope of the order. The data clearly establishes that Bulgaria, using the same methodology as used in prior reviews, is a producer of goods that fall within the scope of the order.

Accordingly, the Court should remand this matter to the Department and direct the Department to reconsider its selection of the surrogate country and to fully evaluate the quality of data from both Bulgaria and Turkey.

Respectfully submitted,

/s/ David J. Craven

David J. Craven
Counsel to Tianjin Magnesium
International Co., Ltd. and Tianjin
Magnesium Metal Co., Ltd

Craven Trade Law LLC
3744 N Ashland
Chicago, IL 60613
(773) 709-8506
David.craven@tradelaw.com

Date June 5, 2025