Slip Op. 26-28

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **TIANJIN MAGNESIUM INTERNATIONAL CO., LTD. AND TIANJIN MAGNESIUM METAL CO., LTD.,** | |
| Plaintiffs, | **Before: Timothy M. Reif, Judge** |
| v. | **Court No. 25-00002** |
| **UNITED STATES,** | |
| Defendant. | |

## <u>OPINION AND ORDER</u>

[Sustaining in part and remanding in part Commerce's *Final Results*.]

Dated: March 13, 2026

<u>David J. Craven</u>, Craven Trade Law LLC, of Chicago, IL, for plaintiffs Tianjin Magnesium International Co., Ltd. and Tianjin Magnesium Metal Co., Ltd.

<u>Kyle S. Beckrich</u>, Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., for defendant United States.  With him on the brief were <u>Brett A. Shumate</u>, Assistant Attorney General, <u>Patricia M. McCarthy</u>, Director and <u>Reginald T. Blades, Jr.</u>, Assistant Director.  Of counsel was <u>Paul Thornton</u>, Attorney, Office of Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, D.C.

\*     \*     \*

This action concerns the final results of the U.S. Department of Commerce ("Commerce") in the administrative review of the antidumping ("AD") order on pure magnesium from the People's Republic of China ("China") for the period of review ("POR") May 1, 2022, through April 30, 2023.  *Pure Magnesium from the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2022-2023*

("*Final Results*"), 89 Fed. Reg. 100,967 (Dep't of Commerce Dec. 13, 2024), PR 121,

and accompanying Issues and Decision Memorandum ("IDM") (Dep't of Commerce

Dec. 6, 2024), PR 117.

Tianjin Magnesium International Co., Ltd. and Tianjin Magnesium Metal Co., Ltd.

(collectively, "plaintiffs") challenge certain aspects of the *Final Results* in a motion for

judgment on the agency record pursuant to U.S. Court of International Trade ("USCIT")

Rule 56.2.  Mot. Pursuant to Rule 56.2 Mot. of Pls. for J. on the Agency R. ("Pls. Mot."),

ECF No. 17.  Specifically, plaintiffs request that the court remand to Commerce for

reconsideration of its selection of Türkiye as the primary surrogate country and rejection

of Bulgaria.  *See* Mem. of Law in Supp. of the Rule 56.2 Mot. of Pls. for J. on the

Agency R. ("Pls. Br."), ECF No. 17-1.

For the reasons discussed below, the court sustains in part and remands in part

Commerce's *Final Results*.

## BACKGROUND

On May 12, 1995, Commerce issued the AD order on pure magnesium from

China.  *Notice of Antidumping Duty Orders: Pure Magnesium from the People's*

*Republic of China, the Russian Federation and Ukraine; Notice of Amended Final*

*Determination of Sales at Less than Fair Value: Antidumping Duty Investigation of Pure*

*Magnesium from the Russian Federation*, 60 Fed. Reg. 25,691 (Dep't of Commerce

May 12, 1995).

On July 12, 2023, Commerce initiated the administrative review at issue here.

*Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 88 Fed. Reg.

44,262 (Dep't of Commerce July 12, 2024), PR 6.

On September 25, 2023, Commerce placed the Surrogate Country List ("SC List") on the record. Mem. from Commerce to Interested Parties Pertaining to Interested Parties: Surrogate Value Mem. (Sept. 25, 2023), attach., PR 25. Commerce described the SC List as "a non-exhaustive list of countries that Commerce has determined, based on per capita Gross National Income (GNI), is [sic] at the same level of economic development as China." *Id.* at 1. Commerce solicited comments "on the list as a starting point for surrogate country selection . . . and to propose for consideration other countries that are at a level of economic development comparable to China." *Id.* The SC List contained the following six countries: Romania, Chile, Bulgaria, Costa Rica, Malaysia and Türkiye. *Id.*, attach.

On June 5, 2024, Commerce issued the *Preliminary Results*. *Pure Magnesium from the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review; 2022-2023* ("*Preliminary Results*"), 89 Fed. Reg. 48,149 (Dep't of Commerce June 5, 2024), PR 92, and accompanying Preliminary Decision Memorandum ("PDM") (Dep't of Commerce May 30, 2024), PR 86. Commerce selected preliminarily Türkiye as the primary surrogate country. PDM at 12.

On December 13, 2024, Commerce issued the *Final Results*. *See Final Results*. Commerce continued to select Türkiye as the primary surrogate country. IDM at cmt. 1.

On January 6, 2025, plaintiffs filed summons in the instant action. Summons, ECF No. 1. On January 27, 2025, plaintiffs filed their complaint. Compl., ECF No. 8.

On June 5, 2025, plaintiffs moved for judgment on the agency record pursuant to USCIT Rule 56.2. Pls. Mot.

## JURISDICTION AND STANDARD OF REVIEW

28 U.S.C. § 1581(c) grants to this Court "exclusive jurisdiction of any civil action commenced under section 516A or 517 of the Tariff Act of 1930."

Section 516A of the Tariff Act of 1930 provides that in an action under 19 U.S.C. § 1516a(a)(2), the court will hold unlawful any determination, finding or conclusion that is "unsupported by substantial evidence on the record, or otherwise not in accordance with law."[1] 19 U.S.C. § 1516a(b)(1)(B)(i).

Substantial evidence constitutes "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," but it requires "more than a mere scintilla." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)).  For a reviewing court to "fulfill [its] obligation" to determine whether a determination of Commerce is supported by substantial evidence and in accordance with law, Commerce is required to "examine the record and articulate a satisfactory explanation for its action."  *CS Wind Viet. Co. v. United States*, 832 F.3d 1367, 1376 (Fed. Cir. 2016) (quoting *Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370, 1378 (Fed. Cir. 2013)).

Even so, the court will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned."  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974)); *see also NMB Sing. Ltd. v. United States*, 557 F.3d 1316, 1319 (Fed. Cir. 2009) ("Commerce must explain the basis for its

---

[1] Further citations to the Tariff Act of 1930 are to Title 19 of the U.S. Code, 2018 edition.

decisions; while its explanations do not have to be perfect, the path of Commerce's

decision must be reasonably discernable to a reviewing court.").

Finally, "the Court will not disturb an agency determination if its factual findings

are reasonable and supported by the record as a whole, even if there is some evidence

that detracts from the agency's conclusion." *Shandong Huarong Gen. Corp. v. United

States*, 25 CIT 834, 837, 159 F. Supp. 2d 714, 718 (2001) (citing *Heveafil Sdn. Bhd. v.

United States*, 25 CIT 147, 149 (2001)), *aff'd sub nom. Shandong Huarong Gen. Grp.

Corp. v. United States*, 60 F. App'x 797 (Fed. Cir. 2003).

## DISCUSSION

## I.    Legal framework

19 U.S.C. § 1677b(c)(1) provides that Commerce "shall determine the normal

value of the subject merchandise" in an AD investigation that involves a non-market

economy ("NME") country "on the basis of the value of the factors of production

[("FOPs")] utilized in producing the merchandise and to which shall be added an amount

for general expenses and profit plus the cost of containers, coverings, and other

expenses." *See Juancheng Kangtai Chem. Co. v. United States*, Slip Op. 15-93, 2015

WL 4999476, at *2 (CIT Aug. 21, 2015).

In administrative proceedings that involve an NME country such as China,

Commerce calculates the "normal value" of the subject merchandise by selecting

surrogate data from one or several market economy countries that Commerce

determines constitute the "best available information."  19 U.S.C. § 1677b(c)(1); *Heze

Huayi Chem. Co. v. United States*, 45 CIT __, __, 532 F. Supp. 3d 1301, 1309-10

(2021).

The "best available information" standard involves "a comparison of the competing data sources" in the record.  *Weishan Hongda Aquatic Food Co. v. United States*, 917 F.3d 1353, 1367 (Fed. Cir. 2019).  Section 1677b(c)(1) does not define "best available information," which means that Commerce has "broad discretion" to evaluate record information.  *Zhejiang DunAn Hetian Metal Co. v. United States*, 652 F.3d 1333, 1341 (Fed. Cir. 2011).  When reviewing a determination by Commerce, the "court's duty is 'not to evaluate whether the information Commerce used was the best available, but rather whether a reasonable mind could conclude that Commerce chose the best available information.'"  *Id.* (quoting *Goldlink Indus. Co. v. United States*, 30 CIT 616, 619, 431 F. Supp. 2d 1323, 1327 (2006)).

Commerce, "in valuing factors of production . . . shall utilize, to the extent possible, the prices or costs of factors of production" in a surrogate country that is "at a level of economic development comparable to that of the [NME]," and a "significant producer[] of comparable merchandise."  19 U.S.C. § 1677b(c)(4).  And "[t]o the extent possible, Commerce's regulatory preference is to 'value all factors in a single surrogate country.'"  *Jinko Solar Imp. and Exp. Co. v. United States*, 48 CIT __, __, 701 F. Supp. 3d 1367, 1381 (2024) (quoting 19 C.F.R. § 351.408(c)(2)).

## II.    Commerce's selection of Türkiye as the primary surrogate country

The court concludes that Commerce's explanation of its selection of Türkiye as the primary surrogate country is flawed but adequate.  Commerce erred in concluding that Bulgaria is not a producer of identical merchandise and in stating that Commerce has an established preference for production data over export data.  *See infra* Sections

II.A-B.  Nonetheless, Commerce's selection of Türkiye over Bulgaria is supported by

substantial evidence.

> **A.      Whether Bulgaria is a producer of identical merchandise**

The court concludes that Commerce erred in concluding that Bulgaria does not

produce identical merchandise.

Plaintiffs argue that Commerce's "determination that [Türkiye] was a substantial

producer of subject merchandise and that Bulgaria was not a substantial producer of

subject merchandise is contrary to the facts."  Pls. Br. at 3.  According to plaintiffs,

Commerce "erroneously found that Bulgaria only produced comparable merchandise

while [Türkiye] and Malaysia produced identical merchandise."  *Id.* at 10. Plaintiffs

explain that "[t]he proper comparison product is product that falls within scope," not just

"the simple production of pure magnesium."  *Id.*

Congress defined "subject merchandise" as "the class or kind of merchandise

that is within the scope of an investigation, a review, a suspension agreement, [or] an

order."  19 U.S.C. § 1677(25).  And "[i]n all cases, if identical merchandise is produced,

the country qualifies as a producer of comparable merchandise."  Import Admin., U.S.

Dep't of Commerce, Non-Market Economy Surrogate Country Selection Process, Policy

Bulletin 04.1 (2004), https://enforcement.trade.gov/policy/bull04-1.html (last visited Mar.

9, 2026) ("Policy Bulletin 04.1") (footnote omitted); *see also Mid Continent Nail Corp. v.*

*United States*, 34 CIT 512, 519, 712 F. Supp. 2d 1370, 1377 (2010) ("Identical

merchandise is comparable merchandise.").

Commerce erred when it characterized Bulgaria as a producer only of

comparable merchandise.  The GTA export data establish Bulgaria as a producer of

"Unwrought Magnesium" under HTSUS 8104.11.00 and 8104.19.00, "Magnesium Raspings, Turnings And Granules" and "Magnesium Powders" under HTSUS 8104.30.00 and "Articles Of Magnesium" under HTSUS 8104.90.00, all of which are covered by the order and are thereby considered *identical* merchandise under the statutory definition.  *See* Letter from King & Spalding LLP to Sec'y of Commerce Pertaining to Pet'r Cmts on Surrogate Country Selection ("Pet'r SC Cmts."), attach. 1, PR 31; *see also* IDM at 2-3.  Regardless, Commerce's error does not jeopardize its selection of Türkiye for the reasons discussed below and is therefore harmless.

**B.    Whether Commerce has an established preference for production data over export data**

Plaintiffs argue that Commerce's selection of Türkiye as the primary surrogate country is "not supported by substantial evidence and is thus otherwise not in accordance with law."  Pls. Br. at 10.  Specifically, plaintiffs contend that Commerce relied erroneously on production data rather than export data to conclude that Türkiye was a significant producer of comparable merchandise during the POR.[2]  *See id.* at 14-16.

19 U.S.C. § 1677b(c)(4) provides that:

[Commerce], in valuing factors of production . . . shall utilize, to the extent possible, the prices or costs of factors of production in one or more market economy countries that are—

(A) at a level of economic development comparable to that of the nonmarket economy country, and

---

[2] Plaintiffs do not object to Commerce's determination that Türkiye is at a level of economic development comparable to China.  *See* IDM at 5-6.  For that reason, the court will confine its analysis to the "significant producer of comparable merchandise" criterion.

(B) significant producers of comparable merchandise.

The statute does not define terms such as "significant producer" and "comparable merchandise." *Id.* However, "[s]ome clarification is . . . provided in the Conference Report to the 1988 Omnibus Trade and Competitiveness Act, which added to the statute the current NME provisions and states that 'significant producer' includes any country that is a 'significant net exporter.'" Policy Bulletin 04.1 (quoting *Conference Report to the 1988 Omnibus Trade & Competitiveness Act*, H.R. Rep. No. 100-576 (1988), at 590).

In the *Final Results*, Commerce explained that its "practice is to evaluate whether production is significant based on characteristics of world production of, and trade in, comparable merchandise . . . and to determine whether merchandise is comparable on a case-by-case basis." IDM at 6. Commerce continued that "[w]here there is no production information, Commerce has relied on export data from potential [surrogate countries]." *Id.*

In the instant matter, "petitioner provided export data from Global Trade Atlas (GTA), which shows [sic] that all six countries on Commerce's surrogate country list" — including both Türkiye and Bulgaria — "have exports of various types of magnesium articles during the POR." PDM at 10 (citing Pet'r SC Cmts., attach. 1). Petitioner submitted also USGS data, which list only "Türkiye and Malaysia with the capacity to produce 'primary magnesium,' and list[] Türkiye with an estimated 13,000 metric tons of production in 2021." IDM at 7; Pet'r SC Cmts., attach. 2, tbl. 8.

Based on these data, Commerce determined that "Malaysia and Türkiye were the only producers of identical merchandise" among the potential surrogate countries.

IDM at 7.  And Commerce stated that "because there is [sic] production data on the record which demonstrates that Türkiye and Malaysia were significant producers of identical merchandise, [Commerce] did not need to rely on export data as a proxy for production data."  *Id.*  As discussed supra, Commerce erroneously failed to recognize that Bulgaria also produced subject merchandise; however, this failure was harmless error.

In its determination that Türkiye is a significant producer of identical merchandise, Commerce considered: (1) contemporaneous GTA export data; and (2) out-of-period USGS production data.  *See id.*  This approach comports with the guidelines set forth in the Policy Bulletin.  *See* Policy Bulletin 04.1 (stating that the "significant producer" determination "should be made consistent with the characteristics of *world production* of, and *trade* in, comparable merchandise" (emphasis supplied)).

Plaintiffs fail to cite any authority in support of their assertion that Commerce "has a consistent practice of determining whether a country is a substantial producer of subject merchandise based on export data" primarily.  Pls. Br. at 11.

At the same time, it does not appear as though Commerce has a consistent practice of prioritizing production data in determining whether a country is a substantial producer of comparable merchandise.  Commerce stated that "[w]here there is no production information, Commerce has relied on export data from potential SCs."  IDM at 6.  But Commerce cited only one proceeding that could be read to support this

assertion.[3]  Commerce discussed also its use of export data rather than production data in *Pure Magnesium from China 2011-2012*, *see* IDM at 8 (citing *Pure Magnesium from the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2011-2012* ("*Pure Magnesium 2011-2012*"), 79 Fed. Reg. 94 (Dep't of Commerce Jan. 2, 2014) and accompanying IDM (Dep't of Commerce Dec. 26, 2013)), but neglected an important point of distinction.

In *Pure Magnesium 2011-2012*, Commerce used export data for exports of *comparable* merchandise because data were unavailable for *identical* merchandise. *See Pure Magnesium 2011-2012* IDM at 6.  The point of comparison for the data sources on the record was whether those sources pertained to identical or comparable merchandise, not whether they pertained to production or exports. *Id.*  Indeed, Commerce in that proceeding stated that "[i]n determining whether a potential surrogate country qualifies as a significant producer, [Commerce] has a well-established practice of evaluating *export* data for the HTS categories listed in the scope of the Order for the countries identified as economically comparable potential surrogates by the Office of

---

[3] *See Xanthan Gum from the People's Republic of China: Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination*, 78 Fed. Reg. 2,252 (Dep't of Commerce Jan. 10, 2013) and accompanying PDM at 7-8 (Dep't of Commerce Jan. 3, 2013) (unchanged in final results) ("In this case, record evidence shows that none of the potential surrogate countries is a producer of xanthan gum, and production data of identical merchandise for these countries was [sic] not available. . . .  Consistent with our practice, we first researched export data using the Global Trade Atlas ("GTA") for identical merchandise from the potential surrogate countries.  We found that none of the potential surrogate countries had significant exports of xanthan gum.")

Policy list."[4]  *Id.* at 7 (emphasis supplied).  Again, such a statement does not establish a preference for export data, but it does undermine the notion that there is an established preference for production data.

"An action . . . becomes an 'agency practice' when a *uniform and established procedure* exists that would lead a party, in the absence of notification of change, reasonably to expect adherence to the established practice or procedure."  *Ranchers-Cattlemen Action Legal Found. v. United States*, 23 CIT 861, 884-885, 74 F. Supp. 2d 1353, 1374 (1999) (emphasis supplied); *see also Shandong Huarong Mach. Co. v. United States*, 30 CIT 1269, 1293 n.23, 435 F. Supp. 3d 1261, 1282 n.23 (2006).  The lack of uniformity in Commerce's use of data for the "significant producer" inquiry suggests that, contrary to Commerce's claim, there is no "agency practice" to use production data here.  Even so, Commerce's selection of Türkiye is supported by substantial evidence.

Plaintiffs object to the fact that the USGS data were "out-of-period data covering 2021, which is a period prior to the POR" May 1, 2022, through April 30, 2023.  Pls. Br. at 15.  The USGS data on which Commerce relied were released as part of the USGS

---

[4] *See also Pentafluoroethane (R-125) from the People's Republic of China: Preliminary Affirmative Determination of Sales at Less than Fair Value, Preliminary Affirmative Determination of Critical Circumstances, in Part, Postponement of Final Determination, and Extension of Provisional Measures*, 86 Fed. Reg. 45,959 (Dep't of Commerce Aug. 17, 2021) and accompanying PDM at 8 (Dep't of Commerce (Aug. 10, 2021) (unchanged in final results) ("Among the factors we consider in determining whether a country is a significant producer of comparable merchandise is whether the country is an *exporter* of comparable merchandise.  In order to determine whether the above-referenced countries are significant producers of comparable merchandise, Commerce's practice is to examine which countries on the surrogate country list *exported* merchandise comparable to the subject merchandise." (emphases supplied)).

Minerals Yearbook for 2021.  *See* Pet'r SC Cmts., attach. 2.  While this fact does place

the data outside of the POR, the table that "lists both Türkiye and Malaysia with the

capacity to produce 'primary magnesium,'" IDM at 7, is dated December 31, 2021,

which is just four months outside of the POR.  *See* Pet'r SC Cmts., attach. 2., tbl. 7; *cf.*

*Jinan Yipin Corp. v. United States*, 38 CIT 403, 432, 971 F. Supp. 2d 1296, 1320 (2014)

(sustaining Commerce's use of non-contemporaneous surrogate values that were "just

a few months outside the period of review"); *see also Dorbest Ltd. v. United States*, 30

CIT 1671, 1691, 462 F. Supp. 2d 1262, 1281 (2006) ("Commerce may not always

elevate contemporaneity, or its desire to have data covering an entire POI, over the

need for accuracy."); *QVD Food Co. v. United States*, 34 CIT 1166, 1169-71, 721 F.

Supp. 2d 1311, 1315-17 (2010) (sustaining Commerce's selection of financial

statements that were non-contemporaneous by six years because they "contain[ed]

more reliable pricing data") *aff'd*, 658 F.3d 1318 (Fed. Cir. 2011).

Moreover, the table that "lists Türkiye with an estimated 13,000 metric tons of

production in 2021," IDM at 7, purports to "include[] data available through November

16, 2022," Pet'r SC Cmts., attach. 2, tbl. 8.  That would place at least some portion of

the data within the POR.

By contrast, the GTA export data list Bulgaria as exporting only 1,499 tons of

identical merchandise during the POR.  *See* Pet'r SC Cmts., attach. 1.  And the only in-

period Bulgarian production data that respondents submitted is a screenshot of a

webpage in which a Bulgarian aluminum company claims to "have a total capacity of

100 thousand tons per year" for the production of "flat-rolled and extruded aluminum

products," which are not covered by the scope of the order.  *See* Letter from Craven

Trade Law LLC to Sec'y of Commerce Pertaining to TMMC SV Cmts., Ex. SV-1, PR 34;

IDM at 2-3.  Moreover, the GTA data purport to include exports of comparable

merchandise from both Türkiye and Bulgaria, *see* Pet'r SC Cmts., attach. 1, but this fact

does not by itself weigh in favor of selecting the latter given the other data on the

record.  *See id.*

      In sum, Commerce was presented with a choice between: (1) Turkish production

data for *identical* merchandise some of which was slightly non-contemporaneous; and

(2) Bulgarian production data for arguably *comparable* merchandise that was

contemporaneous.  Commerce's selection of the first option was reasonable given

Commerce's longstanding preference for data on identical rather than comparable

merchandise.  *See* Policy Bulletin 04.1.  And even though both Türkiye and Bulgaria

exported identical and comparable merchandise during the POR, these exports

occurred at vastly different volumes.  *See* Pet'r SC Cmts, attach. 1.  Accordingly,

Commerce's decision is supported by substantial evidence despite the slight non-

contemporaneousness of the USGS data.[5]  *See* Policy Bulletin 04.1.

      The court sustains Commerce's selection of Türkiye as the primary surrogate

country.

---

[5] The aforementioned lack of an "agency practice" has no bearing on the
reasonableness of Commerce's decision here.  *See Dupont Teijin Films v. United
States*, 38 CIT 1099, 1106, 997 F. Supp. 2d 1338, 1345 (2014) ("Because world
production data were not available, Commerce reasonably looked to other sources of
data on the record, including export data and Astrapak's financial statement.").

### III.    Data quality

Plaintiffs argue that Commerce "elected to use the data from [Türkiye]

notwithstanding multiple serious problems with the quality of the data, and critically, the

absence of the same flaws in the Bulgaria[n] data."  Pls. Br. at 16.

The U.S. Court of Appeals for the Federal Circuit has observed that "[a]s early as

2004, Commerce has followed a four-step process to select a surrogate country":

> (1) the Office of Policy ("OP") assembles a list of potential surrogate
> countries that are at a comparable level of economic development to the
> [non-market economy] country; (2) Commerce identifies countries from the
> list with producers of comparable merchandise; (3) Commerce determines
> whether any of the countries which produce comparable merchandise
> are significant producers of that comparable merchandise; and (4) if more
> than one country satisfies steps (1)-(3), Commerce will select the country
> with the best factors data.

*Jiaxing Bro. Fastener Co. v. United States*, 822 F.3d 1289, 1293 (2016) (quoting *Vinh

Hoan Corp. v. United States*, 39 CIT __, __, 49 F. Supp. 3d 1285, 1292 (2015)).  With

respect to the fourth step, Commerce in the *Final Results* determined that it was not

required to consider whether Bulgaria has "superior data" because Commerce did not

determine that Bulgaria is a significant producer of comparable merchandise.  IDM at 9.

According to the Policy Bulletin, "if identical merchandise is produced, the

country qualifies as a producer of comparable merchandise."  Policy Bulletin 04.1.

Commerce's policy is to favor significant producers of identical merchandise over

significant producers of comparable merchandise.  *See id.* n.6 ("If considering a

producer of identical merchandise leads to data difficulties, the operations team may

consider countries that produce a broader category of reasonably comparable

merchandise."); *see also Chlorinated Isocyanurates from the People's Republic of*

*China: Final Results of Antidumping Duty Administrative Review; 2017-2018*, 85 Fed.

Reg. 10,411 (Dep't of Commerce Feb. 24, 2020) and accompanying IDM at 10-11

(Dep't of Commerce Feb. 14, 2020).

As discussed above, Commerce's rejection of Bulgaria was based on the

reasonable determination that only Türkiye and Malaysia were significant producers of

identical merchandise.  *See supra* Section II.  Neither the statute nor Commerce's

regulations requires that Commerce assess whether the Bulgarian surrogate values are

superior to the Turkish and Malaysian surrogate values on the record.  Accordingly, the

court will consider only plaintiffs' four objections to the use of specific Turkish surrogate

values, addressing each in turn.

> **A.    Dolomite**

The court concludes that the Turkish dolomite values are not aberrational.

Plaintiffs argue that "Turkey's import data for dolomite," an input for subject

merchandise, "is aberrational on both quantity and price."  Pls. Br. at 17.  With respect

to quantity, plaintiffs contend that dolomite imports during the POR were far below

standard commercial quantities.  *Id.*

In *Jacobi Carbons AB v. United States*, 43 CIT __, __, 422 F. Supp. 3d 1318

(2019), this Court addressed a similar issue of import quantity and noted that "[w]hile a

surrogate value must be as representative of the situation in the NME country as is

feasible, Commerce need not duplicate the exact production experience of the

[Chinese] manufacturers at the expense of choosing a surrogate value that most

accurately represents the fair market value of [the factor] in a [hypothetical] market-

economy [China]."  *Id.* at __, 422 F. Supp. 3d at 1327 (second, third, fourth and fifth

alterations in original) (internal quotation marks omitted) (quoting *Nation Ford Chem. Co. v. United States*, 166 F.3d 1373, 1377 (Fed. Cir. 1999)); *see also Bio-Lab, Inc. v. United States*, 49 CIT __, __, 776 F. Supp. 3d 1315, 1342 (2025). The Court upheld Commerce's determination despite the "substantial difference between the Malaysian import quantity and the amount of bituminous coal [plaintiff] consumes" because "Commerce considered this evidence, acknowledged the quantitative difference, and was not persuaded that the difference rendered the Malaysian value unusable." *Jacobi Carbons*, 43 CIT at __, 422 F. Supp. 3d at 1327.

In the instant case, respondents raised issues with the dolomite import quantities to which Commerce responded, IDM at 9; however, plaintiffs fail to support their contention that the Turkish imports of dolomite were not in commercial quantities. For example, plaintiffs assert summarily that the fact that "Dolomite is a high-bulk low value rock" is "well-known" and "was confirmed by [Commerce] in this review during the plant tour conducted in conjunction with verification." Pls. Br. at 17 (citing Verification from Commerce to File Pertaining to TMMC – Verification Report ("Verification Report") at 10, PR 99). But this purported aspect of dolomite is not mentioned in the verification report. *See* Verification Report. The same is true of plaintiffs' contention that "[e]ven 1 ton of Dolomite is not a commercial quantity."[6] Pls. Br. at 17; *see* Verification Report.

---

[6] The court notes that this assertion is without factual support. *See id.*; *see also* Reply to Resp. of Def. to Pl.'s Mot. for J. Upon the Agency R. ("Pls. Reply Br.") at 10, ECF No. 20. Plaintiffs cite only to their rebuttal comments during the underlying proceeding in which they make the same unsupported contention. *See* Letter from Craven Trade Law LLC to Sec'y of Commerce Pertaining to TMMC – Rebuttal to Pet'r Cmts. at 5-6, PR 61.

As in *Jacobi Carbons*, plaintiffs "merely disagree with Commerce's conclusion." 43 CIT at __, 422 F. Supp. 3d at 1327.  Such disagreement is an insufficient basis on which to determine that the dolomite import quantities are aberrational.

Plaintiffs argue also that the import price for dolomite in Türkiye is aberrational when compared to the prices for other countries on the SC List.  Pls. Br. at 18.

"Commerce's longstanding administrative practice with respect to aberrational data is to disregard small-quantity import data when the per-unit value is substantially different from the per-unit values of the larger quantity imports of that product from other countries."  *Bio-Lab*, 49 CIT at __, 776 F. Supp. 3d at 1342 (internal quotation marks omitted) (quoting *Shakeproof Assembly Components Div. of Illinois Tool Works, Inc. v. United States*, 23 CIT 479, 485, 59 F. Supp. 2d 1354, 1360 (1999)).

"Commerce considers import data to be aberrationally high if that data is 'many times higher than the import values from other countries.'"  *SolarWorld Ams., Inc. v. United States*, 42 CIT __, __, 320 F. Supp. 3d 1341, 1351 (2018); *Best Mattresses Int'l Co. v. United States*, 47 CIT __, __, 622 F. Supp. 3d 1347, 1379 (2023).  Moreover, "[w]hile there is no bright-line rule for what multiple of other price values would qualify as 'aberrational,' the court has previously affirmed the exclusion of 'aberrational values' that were nearly 30 times higher than other values, . . . and 30 and 79 times higher than the average unit value."  *Best Mattresses*, 47 CIT at __, 622 F. Supp. 3d at 1379.

In the instant case, the Turkish import price is approximately four times higher than the average price on the SC List.  *See* Pls. Br. at 18.  The same is true of the Malaysian import price.  *See id.*  Considering the relevance of the Court's prior decisions on this issue, the court is unable to conclude that the Turkish import price for

dolomite is aberrational.  Rather, it was reasonable for Commerce to determine that

there was "no basis to change [its] methodology from the *Preliminary Results* of using

the dolomite surrogate value from Türkiye."  IDM at 9.

> Accordingly, Commerce's selection of the Turkish surrogate values for dolomite

is supported by substantial evidence.  The court sustains on this point.

### B.    Natural gas

> The court concludes that Commerce's selection of the Turkish natural gas data

was reasonable and is supported by substantial evidence.

> Plaintiffs argue that "[t]he GTA data from [Türkiye] was [sic] incomplete as there

was [sic] no data for the price of natural gas."  Pls. Br. at 19.  Plaintiffs explain that it

used natural gas in a "gaseous state" in its production of subject merchandise, but the

Turkish surrogate value for natural gas contained import data for liquified natural gas

only.  *Id.*  This argument is unavailing.

> In the *Final Results*, Commerce cited a prior proceeding in which Commerce

determined that "a standard conversion for the physical state of the natural gas input

does not significantly impact the specificity of the data."  IDM at 9 (quoting *Common

Alloy Aluminum Sheet from the People's Republic of China: Final Results of

Antidumping Duty Administrative Review, Final Successor-in-Interest Determination,

and Final Determination of No Shipments; 2018-2020*, 86 Fed. Reg. 74,066 (Dep't of

Commerce Dec. 29, 2021) and accompanying IDM (Dep't of Commerce Dec. 22, 2021)

at 28).

> Plaintiffs do not take issue with the conversion factor that Commerce used, but

state merely that "[l]iquified gas is totally different from gaseous natural gas in all

aspects including unit price." Pls. Br. at 19. Plaintiffs fail to recognize that "[t]he only

question is whether the conversion factor is correlated to the value of the particular

energy source selected as the surrogate value" and not whether the surrogate value is

for the same state of matter as the energy source. *Carbon Activated Tianjin Co. v.*

*United States*, 46 CIT __, __, 586 F. Supp. 3d 1360, 1377 (2022).

Commerce noted also that its selection of Turkish energy data is in accordance

with Commerce's stated "preference for data from a single surrogate country." IDM at

9-10 (citing *Steel Propane Cylinders from the People's Republic of China: Final*

*Determination of Sales at Less than Fair Value*, 84 Fed. Reg. 29,161 (Dep't of

Commerce June 21, 2019) and accompanying IDM at 22 (Dep't of Commerce June 17,

2019)). This practice is well-established and codified in Commerce's regulations. *See*

19 C.F.R. § 351.408(c)(2) ("The Secretary normally will value all factors in a single

surrogate country."); *see also Jinko Solar*, 48 CIT at __, 701 F. Supp. 3d at 1381.

The court declines to second-guess Commerce's decision in selecting among

potential surrogate values for natural gas. Commerce explained its selection

adequately and supported that selection with substantial evidence. The court sustains

on this point.

### C.    Electricity

The court concludes that Commerce did not explain adequately its selection of

the Turkish surrogate value for electricity.

Plaintiffs argue that "[t]he electricity price provided for [Türkiye] was not for

industrial use." Pls. Br. at 19. Plaintiffs maintain that the Turkish electricity price was

based on a "'monthly bill for [a] commercial warehouse'" in a case study for Istanbul and thereby did not constitute a "price for industrial users." *Id.*

In the *Final Results*, Commerce selected the Turkish electricity price as reported in The World Bank Group's *Doing Business 2020: Turkey* ("*Doing Business Turkey*"). *See* PDM at 18 (unchanged in final results). Commerce explained that the electricity price is the "best available information" based on its practice of selecting, "to the extent practicable, [surrogate values] which are (1) broad market averages; (2) product-specific; (3) tax exclusive, non-export average values; and (4) contemporaneous with the POI." IDM at 10. Commerce added that the Turkish data in question constitute "the only source of electricity from the primary surrogate country." *Id.* Commerce's explanation is inadequate for two reasons.

First, Commerce enumerated the factors described above, but it did not explain the ways in which the Turkish electricity price did or did not reflect those factors. *See id.* It is not sufficient to state merely that a surrogate value is "the 'best available information' to value factors of production . . . for electricity, based on the above enumerated factors." *Id.* "For the court to conclude that a reasonable mind would support Commerce's selection of the best available information, Commerce needs to justify its selection of data with a reasoned explanation." *Dorbest*, 30 CIT at 1677, 462 F. Supp. 2d at 1269.

Second, Commerce's contention that "Commerce has used *Doing Business* to value electricity in other cases when a party objected that it was not specific to industrial users" is misleading. IDM at 10. Commerce cited to a prior proceeding in which Commerce used electricity data from *Doing Business 2020: South Africa* ("*Doing*

*Business South Africa*").  *See Certain Aluminum Foil from the Republic of Armenia:*

*Final Affirmative Determination of Sales at Less Than Fair Value*, 86 Fed. Reg. 52,882

(Dep't of Commerce Sept. 23, 2021) and accompanying IDM at 10 (Dep't of Commerce

Sept. 16, 2021).

The respondent in that proceeding argued, like plaintiffs here, that the electricity

data were improper "because *Doing Business South Africa* values electricity

consumption for a warehouse, not a production facility."  *Id.* at 9.  However, Commerce

in that proceeding provided a fuller explanation of the superiority of *Doing Business*

*South Africa* as compared to the respondent's preferred South African electricity data

source and concluded with a determination that "the *Doing Business South Africa*

data . . . are broad market averages that are tax-exclusive and product-specific."  *See*

*id*. at 10.  No such explanation is present here.

Accordingly, the court remands for further explanation or reconsideration of

Commerce's selection of the Turkish surrogate value for electricity.

**D.    Inflation**

The court concludes that plaintiffs fail to demonstrate that the inflationary

environment in Türkiye should preclude Commerce from selecting Turkish surrogate

values.

Plaintiffs object to the use of Turkish surrogate values on the grounds that

Türkiye "has a high rate of inflation, which . . . artificially increase[s] the prices of the key

inputs."  Pls. Br. at 20.  Plaintiffs contend that "[t]his hyper-inflation has resulted in

aberrational factor values, even if certain of the values were adjusted."  *Id.*  Plaintiffs

mention specifically values for labor, electricity, truck freight, brokerage and handling and ocean insurance. *Id.*

Plaintiffs' arguments are unavailing. Plaintiffs fail to cite any legal support for the contention that an inflationary environment will automatically disqualify a potential surrogate country from selection. *See* Pls. Br.; *see also* Pls. Reply Br. And in the *Final Results*, Commerce explained that "[n]either the statute, Commerce's regulations, nor administrative precedent mandates Commerce to disqualify a potential surrogate country, so long as the requirements of [19 U.S.C. § 1677b(c)(4)] are met and the potential surrogate country provides publicly available, adequate, and reliable data from quality sources." IDM at 11.

At no point have plaintiffs demonstrated that Türkiye does not meet the statutory requirements set forth in § 1677b(c)(4). Instead, plaintiffs "merely disagree with Commerce's conclusion." *Jacobi Carbons*, 43 CIT at __, 422 F. Supp. 3d at 1327. Moreover, Commerce "need not address every piece of evidence presented by the parties; absent a showing to the contrary, the court presumes that [Commerce] has considered all of the record evidence." *Siemens Energy, Inc. v. United States*, 38 CIT 879, 885, 992 F. Supp. 2d 1315, 1324 (2014), *aff'd*, 806 F.3d 1367 (Fed. Cir. 2015).

Commerce addressed plaintiffs' concerns and stated that it is aware of "the inflationary environment in Türkiye," but noted that "the country has remained on Commerce's surrogate country list for investigative periods dating back to at least 2019 and has been used as a surrogate country in multiple proceedings." IDM at 11; *see Certain Metal Lockers and Parts Thereof from the People's Republic of China: Final Affirmative Determination of Sales at Less than Fair Value*, 86 Fed. Reg. 35,737 (Dep't

of Commerce July 7, 2021) and accompanying IDM at cmt. 1 (Dep't of Commerce June 28, 2021) (recognizing that "hyperinflation is not a basis or criterion for surrogate country selection" and explaining that "Commerce's hyperinflation methodology applies to proceedings where material costs are experiencing rapid changes in price levels which impact the total cost of manufacturing").  Given plaintiffs' failure to demonstrate that the inflationary environment in Türkiye is grounds for its disqualification, the court sustains on this point.

## CONCLUSION

In conclusion, the court sustains in part and remands in part Commerce's *Final Results*.  For the reasons provided above, it is hereby

**ORDERED** that on remand Commerce shall explain further or reconsider its selection of the Turkish surrogate value for electricity; it is further

**ORDERED** that Commerce shall file with the court its remand redetermination within 90 days following the date of this Opinion and Order; it is further

**ORDERED** that the moving parties shall have 30 days from the filing of the remand redetermination to submit comments to the court; and it is further

**ORDERED** that should the moving parties submit comments, defendant shall have 15 days from the date of filing of the comments to submit a response.

**SO ORDERED.**

/s/      Timothy M. Reif
Timothy M. Reif, Judge

Dated: March 13, 2026
         New York, New York