A-570-832
Remand: Slip Op. 26-28
**Public Document**
E&C/III:  JSC

***Tianjin Magnesium International Co. v. United States*,**
**Slip Op. 26-28, Ct. No. 25-002 (CIT)**
**Pure Magnesium from China**

**FINAL RESULTS OF REDETERMINATION
PURSUANT TO COURT REMAND**

**I.      SUMMARY**

The U.S. Department of Commerce (Commerce) prepared these final results of

redetermination pursuant to the remand order of the U.S. Court of International Trade (CIT or the

Court) in *Tianjin Magnesium International Co. v. United States*, Slip Op. 26-28, Ct. No. 25-002

(CIT March 13, 2026) (*Remand Order*).  These final results of redetermination concern the

administrative review of the antidumping duty order on pure magnesium from the People's

Republic of China (China) covering the period of review (POR) May 1, 2022, through April 30,

2023.[1]  The Court remanded, in part, the *Final Results*, for Commerce to explain further, or

reconsider, its selection of the Turkish surrogate value (SV) for electricity.[2]  Commerce has

reconsidered its selection of the Turkish SV for electricity.  For these final results of

redetermination, Commerce is relying on the national average of industrial electricity rates for

January through June 2022 from the Turkish Statistical Institute.[3]  Therefore, the revised

---

[1] *See Pure Magnesium from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review; 2022-2023*, 89 FR 100967 (December 13, 2024) (*Final Results*), and accompanying Issues and Decision Memorandum (IDM); *Pure Magnesium from the People's Republic of China:  Amended Final Results of Antidumping Duty Administrative Review; 2022-2023*, 90 FR 7078 (January 21, 2025) (*Amended Final Results*).
[2] *See Remand Order* at 22.
[3] *See* US Magnesium LLC (Petitioner)'s Letter, "Petitioner's Surrogate Country and Value Reply," dated January 2, 2024 (Petitioner's Second SV Submission), at Attachment III.

estimated weighted-average dumping margin for Tianjin Magnesium International Co. and

Tianjin Magnesium Metal Co. Ltd. (collectively, MMC)[4] is 23.96 percent.[5]

## II.    BACKGROUND

Commerce published its *Final Results* on December 13, 2024.[6]  Commerce published its

*Amended Final Results* on January 21, 2025.[7]  MMC challenged Commerce's *Amended Final*

*Results* with respect Commerce's selection of Türkiye as the primary surrogate country (SC), the

SV source used to value dolomite, the SV source used to value natural gas, the SV source used to

value electricity, and if the inflationary environment in Türkiye precludes Commerce from

selecting Turkish SVs.  The Court sustained in part and remanded in part the *Amended Final*

*Results*.[8]

The Court sustained Commerce's selection of Türkiye as the primary SC, its SV

selections of dolomite and natural gas, and Commerce's ability to select Turkish SV sources

despite the inflationary environment.[9]  The Court remanded the issue of Commerce's SV

selection for electricity prices.[10]  Specifically, the Court stated that Commerce failed to explain

both how the Turkish electricity price from the World Bank Group's *Doing Business Turkey 2020*

(*Doing Business Turkey*)[11] reflected Commerce's four factors for picking the best SVs and why

---

[4] In the 2011-2012 administrative review, Commerce collapsed both Tianjin Magnesium International Co. and Tianjin Magnesium Metal Co. Ltd. into a single entity.  *See Pure Magnesium from the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2011-2012*, 79 FR 94 (January 2, 2014), and accompanying IDM at fn 1.

[5] *See* Memorandum, "Draft Remand Final Analysis Memorandum for Tianjin Magnesium Metal Co., Ltd.," dated May 14, 2026 (Analysis Memorandum).

[6] *See Final Results*, 89 FR 100967.

[7] *See Amended Final Results*, 90 FR at 7078.

[8] *See Remand Order* at 24.

[9] *Id.* at 6-20, 22-24.

[10] *Id.*

[11] *See* Petitioner's Letter, "Submission Of Surrogate Values," dated December 15, 2023 (Petitioner's First SV Submission), at Exhibit I-4.

using the *Doing Business* report was reasonable, in light of MMC's argument that the electricity

prices in *Doing Business Turkey 2020* are not specific to industrial users.[12]

### III.   REMAND ORDER

   a.   Background

   In the *Final Results*, Commerce selected the Turkish electricity price as reported in *Doing*

*Business Turkey* and explained that the electricity price is the "best available information" based

on its practice of selecting, "to the extent practicable, SVs which are (1) broad market averages;

(2) product-specific; (3) tax exclusive{}; and (4) contemporaneous with the PO{R}."[13]   The

Court held Commerce's explanation inadequate because Commerce did not explain the way in

which the Turkish electricity price did or did not reflect those factors and it was not sufficient to

state that a surrogate value is "the best available information to value factors of production … for

electricity based on the above enumerated factors."[14]

Second, the Court held that Commerce did not adequately address MMC's argument that

*Doing Business Turkey* values electricity based on a commercial warehouse, not a production

facility.[15]   In contrast, in *Certain Aluminum Foil from Armenia*, Commerce provided a fuller

explanation of the superiority of *Doing Business South Africa* as compared to the respondent's

preferred South African electricity data source and concluded that its use of the *Doing Business*

*South Africa* data are broad market averages that are tax-exclusive and product-specific.[16]   The

Court held in the *Final Results*, no such explanation was provided.[17]   The Court then remanded

---

[12] *See Remand Order* at 20-22.
[13] *Id.* (citing *Final Results* IDM at 10).
[14] *Id.*
[15] *Id.*
[16] *Id.* at 21-22 (citing *Certain Aluminum Foil from the Republic of Armenia:  Final Affirmative Determination of Sales at Less Than Fair Value,* 86 FR 52882 (September 23, 2021) (*Aluminum Foil from Armenia*), and accompanying IDM at 10.
[17] *Id.* at 22.

to Commerce for further explanation or reconsideration of its selection of the Turkish SV for electricity.[18]

    b.  <u>Analysis</u>

Section 773(c)(1) of the Tariff Act of 1930, as amended (the Act), directs Commerce to base the valuation of the factor of production (FOP) on "the best available information regarding the values of such factors." When considering what constitutes the best available information, Commerce normally considers several criteria, including whether the SV data are contemporaneous, publicly available, tax and duty exclusive, representative of a broad market average, and specific to the FOP in question.[19] There is no hierarchy among these criteria, and it is Commerce's practice to carefully consider the available evidence in light of the particular facts of each industry when undertaking its analysis.[20] However, Commerce's preference is to satisfy the breadth of these selection factors, and to value all FOPs in the primary SC.[21]

The record of the underlying administrative review contains four sources[22] of SVs to value electricity: (1) *Doing Business Turkey 2020*;[23] (2) Turkish Statistical Institute average of industrial electricity rates for January – June 2022;[24] (3) *Doing Business Malaysia 2020*;[25] and

---

[18] *Id.*

[19] *See, e.g.*, *Certain Steel Nails from the People's Republic of China: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2018-2019*, 86 FR 33219 (June 24, 2021) (*Steel Nails from China*), and accompanying IDM at Comment 1; *Notice of Final Determination of Sales at Less Than Fair Value and Affirmative Critical Circumstances, In Part: Certain Lined Paper Products from the People's Republic of China*, 71 FR 53079 (September 8, 2006) (*CLPP from China*), and accompanying IDM at Comment 3.

[20] *See, e.g.*, *Steel Nails from China* IDM at Comment 1; *CLPP from China* IDM at Comment 3.

[21] *See, e.g.*, *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China: Final Determination of Sales at Less Than Fair Value, and Affirmative Final Determination of Critical Circumstances, in Part*, 77 FR 63791 (October 17, 2012), and accompanying IDM at Comment 9; *see also Certain Frozen Fish Fillets From the Socialist Republic of Vietnam: Final Results of the First Administrative Review*, 71 FR 14170 (March 21, 2006), and accompanying IDM at Comment 3.

[22] *See* Memorandum, "Preliminary Surrogate Value Memorandum," dated May 30, 2024.

[23] *See* Petitioner's First SV Submission at Exhibit I-4.

[24] *See* Petitioner's Second SV Submission at Attachment III. While this price was included in petitioner's SV rebuttal submission, we note the information was timely filed pursuant to 19 CFR 351.301(c)(3)(ii).

[25] *See* Petitioner's First SV Submission at Exhibit II-4.

(4) *National Statistics Institute of Bulgaria* average of non-household electricity rates for January 2022 – June 2023.[26]

On remand, we find that the second option, the Turkish Statistical Institute average of industrial electricity rates for January – June 2022 is the best option to value electricity.  We find the source represents a broad market average because it represents a national average electricity price for industrial consumers, and that it is contemporaneous with the POR.  We note, however, that the source is not tax exclusive.[27]  While this source being not tax exclusive is a weakness, it is not disqualifying.  Commerce has relied on sources that are not tax exclusive to value FOPs.[28]  Commerce must consider the breadth of the SV selection factors and weigh the factors against each and consider the case-specific facts to determine which source constitutes the best available sources.  As explained below, despite the fact that this source is not tax exclusive, it constitutes the best available information because it is superior to *Doing Business Turkey* in terms of being a broad market average and contemporaneous with the POR.

In contrast, we find the electricity price in *Doing Business Turkey* does not represent a broad market average; rather the price represents the electricity price for a commercial warehouse in Istanbul, and is not contemporaneous with the POR.  We note that the *Doing Business Turkey* price is exclusive of value-added tax.[29]

---

[26] *See* MMC's Letter, "Surrogate Value Submission," dated October 30, 2023 (MMC's SV Submission), at 5 and Exhibit SV-7 (Attachment 9).

[27] *See* Petitioner's Second SV Submission at Attachment III.

[28] *See Certain Frozen Warmwater Shrimp the Socialist Republic of Vietnam:  Preliminary Results of Antidumping Duty Administrative Review and Partial Rescission of Review; 2014-2015*, 81 FR 12702 (March 10, 2016), and accompanying Preliminary Decision Memorandum (PDM) at 17, unchanged in *Certain Frozen Warmwater Shrimp from the Socialist Republic of Vietnam:  Final Results of Antidumping Duty Administrative Review, 2014-2015*, 81 FR 62717 (September 12, 2016); *see also Certain Steel Nails From the People's Republic of China:  Preliminary Results of Antidumping Duty Administrative Review and Preliminary Determination of No Shipments; 2021-2022*, 88 FR 58242 (August 25, 2023), and accompanying PDM at 13-14 ("valu{ing} electricity using the price data based on Turkish electricity prices as published by the Turkish Statistical Institute"), unchanged in *Certain Steel Nails from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review and Determination of No Shipments; 2021-2022*, 89 FR 14630 (February 28, 2024).

[29] *See* Petitioner's First SV Submission at Exhibit II-4.

Based on the analysis above, we find that while neither electricity data from the Turkish Statistical Institute nor the price from *Doing Business from Turkey* perfectly meet Commerce's SV selection criteria, the weaknesses are not disqualifying.[30]  When all possible data sources are imperfect, Commerce carefully considers the case-specific facts, considering the breadth of the selection criteria, and makes a reasonable determination as to which imperfect data source is the best available information.[31]  The evidence on the record demonstrates that the data from the Turkish Statistical Institute better meet the criteria of representing a broad market and contemporaneity than the price from *Doing Business Turkey*.[32]  Further, we find relying on a data source from outside the primary SC (*i.e.*, the *Doing Business Malaysia 2020* data[33] or the *National Statistics Institute of Bulgaria* data[34]) would introduce additional distortions in Commerce's valuation of electricity.[35]  Based on the analysis above, we find that electricity data from the Turkish Statistical Institute are the best available information.

---

[30] *Compare id.*, *and* Petitioner's Second SV Submission at Attachment III.

[31] *See, e.g.*, *Common Alloy Aluminum Sheet from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review; 2020-2021*, 87 FR 54975 (September 8, 2022), and accompanying IDM at 26; *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China:  Final Determination of Sales at Less Than Fair Value, and Affirmative Final Determination of Critical Circumstances, in Part*, 77 FR 63791 (October 17, 2012), and accompanying IDM at Comment 9; *Certain Frozen Fish Fillets from the Socialist Republic of Vietnam:  Final Results, and Final Results of No Shipments of the Antidumping Duty Administrative Review; 2016-2017*, 87 FR 18007 (April 29, 2017), and accompanying IDM at Comment 3B; *United Steel and Fastener, Inc., v. United States*, 469 F.Supp.3d 1390, 1398 (CIT 2020); and *Home Meridian Intern., Inc. v. United* States, 772 F.3d 1289, 1296 (Fed. Cir. 2014) ("The data on which Commerce relies to value inputs must be the 'best available information,' but there is no requirement that the data be perfect.").

[32] *Compare* Petitioner's Second SV Submission at Attachment III, *with* Petitioner's First SV Submission at Exhibit II-4.

[33] In addition to the distortions introduced by relying on a data source from outside the primary SC, the *Doing Business Malaysia 2020* data does not represent a broad market average; rather, the price represent the electricity price for a commercial warehouse, and is not contemporaneous with the POR.  *See* Petitioner's First SV Submission at Exhibit II-4.

[34] *See* MMC's SV Submission at 5 and Attachment 9.

[35] The CIT has found that Commerce's preference to use values that prevail in a single market economy country "stems from the sensible conclusion that deriving the surrogate data from one {SC} limits the amount of distortion introduced into {Commerce's} calculations because a domestic producer would be more likely to purchase a product available domestically."  *See Jacobi Carbons AB v. United States*, 992 F. Supp. 2d 1360, 1376-77 (CIT 2014) (quoting *Clearon Corp. v. United States*, 37 CIT 220, 229 (2013) (citing 19 CFR 351.408(c)(2)));  *see also Remand Order* at 6-14 (sustaining Commerce's selection of Türkiye as the primary SC).

## IV.    INTERESTED PARTY COMMENTS

On May 14, 2026, Commerce released the draft results of redetermination to all

interested parties and invited parties to comment.[36] No parties submitted comments.

## V.    FINAL RESULTS OF REDETERMINATION

Based on the analysis and explanation described above, Commerce has changed its

selection of data source to value electricity.  As a result, the estimated weighted-average dumping

margin for MMC is revised to 23.96 percent.[37]

6/10/2026

X _Chris / Abbott_

Signed by: CHRISTOPHER ABBOTT

Christopher Abbott
Deputy Assistant Secretary
  for Policy and Negotiations,
  performing the non-exclusive functions and duties
  of the Assistant Secretary for Enforcement and Compliance

---

[36] *See* Draft Results of Redetermination Pursuant to Court Remand, *Tianjin Magnesium International Co., v. United States*, Slip Op. 26-28, (CIT March 13, 2026), dated May 14, 2026.
[37] *See* Analysis Memorandum.